UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

```
In Re:                              )
DOUGLAS J. CONDIDORIO, Debtor,      )
                                    )
_____)
                                    )
DOUGLAS J. CONDIDORIO,              )
                                    )
     Appellant,                     )
                                    )
          v.                        )   NO.  3:10-0441
                                    )   Adv. Proc. No. 3:09-ap-0126
REGIONS BANK,                       )
                                    )   Judge Campbell/Bryant
     Appellee.                      )
```

**TO: The Honorable Chief Judge Todd J. Campbell**

## REPORT AND RECOMMENDATION

Debtor Douglas J. Condidorio has appealed from the judgment of the United States Bankruptcy Court holding that his indebtedness to Regions Bank is excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(B), and his appeal has been transferred to this Court for further proceedings, pursuant to 28 U.S.C. § 158(a) and Federal Rule of Bankruptcy Procedure 8001 et seq. (Docket Entry No. 1-2).

The record from the Bankruptcy Court has been filed (Docket Entry No. 1) and the parties have filed their briefs (Docket Entry Nos. 3, 4 and 6). This case has been referred to the undersigned Magistrate Judge for a report and recommendation on the pending appeal (Docket Entry No. 7).

For the reasons stated below, the undersigned Magistrate Judge **recommends** that the judgment of the Bankruptcy Court be **affirmed.**

## Procedural History

Appellant and debtor Douglas J. Condidorio ("Condidorio" or "Debtor") filed his Chapter 7 bankruptcy petition on February 25, 2009. Appellee Regions Bank ("Regions") filed its adversary complaint on April 15, 2009, challenging the dischargeability of Condidorio's obligation that is the subject of this appeal. Following a trial on March 10, 2010, the Bankruptcy Court ruled in favor of Regions on March 24, 2010. Condidorio thereafter filed his timely appeal.

## Factual Summary

Condidorio at all pertinent times was a member and owner of a minority interest in RLG, LLC ("RLG"), a limited liability company that owned Kings Creek Golf Club near Spring Hill, Tennessee (Tr. at 200).[1] David Miller was the managing member of RLG (Tr. at 202). Condidorio first invested in RLG in approximately 2004 (Tr. at 202).[2] From time to time after his investment, Condidorio and other members were requested by Miller to execute personal guaranties of loans made to RLG by various lenders (Tr. 2 at 202-03). Condidorio executed the requested guaranties. He did not keep copies of the guaranties that he signed, but instead relied on Miller to maintain those records in his capacity as

---

[1] Citations to the transcript of the March 10, 2010, trial are indicated as "Tr. at ___.")

[2] Condidorio had also invested in at least two other ventures managed by David Miller. They were Kings Creek Village and Fellowship Associates, LLC (Tr. at 199-202).

"general manager" of RLG (Tr. at 203). As requested by Miller from time to time, Condidorio also provided Miller with personal financial statements in connection with Condidorio's guaranties of loans to RLG. (Tr. at 204).

Condidorio filled out and signed a personal financial statement dated December 19, 2007, and provided it to Miller shortly after that date (Tr. at 204-05). Condidorio understood that Miller planned to provide this financial statement to a lending institution (Tr. at 205). The financial statement filled out and signed by Condidorio failed to disclose any of the contingent liabilities evidenced by his guaranties of the earlier loans to RLG. At trial, Condidorio testified that Miller was to add information about these contingent liabilities before presenting the financial statement to Regions:

> And the agreement was that he [Miller] would give me the form, I would fill it out best I could, and David would include the liabilities because he was the holder and keeper of those liabilities. I did not have access to those.

(Tr. at 205) In response to additional questions, Condidorio testified as follows:

> I expected Mr. Miller to take my personal financial statement, fill in the information that I did not have in terms of all the other loans, all the other percentages that were changing on the fly through this process; as money was entered into the partnerships and money was being moved around, percentages were changing and I didn't have access to that.

3

(Tr. at 212). Condidorio also gave copies of his income tax returns and driver's license to Miller to be provided to financial institutions (Tr. at 206-07).

In late 2007 or early 2008, Miller approached Emmitt Webb of Regions Bank about a loan for the golf course (Tr. at 153-54). Miller gave Webb Condidorio's financial statement dated December 19, 2007, and his income tax returns (Tr. at 155-57). With respect to understandings regarding the completeness of Condidorio's financial statement, Miller testified at trial as follows:

> Q. When Mr. Condidorio gave you this personal financial statement was it your understanding that it was completely filled out when he gave it to you?
>
> A. That would have been my understanding, yes.
>
> Q. Had he already signed it when he gave it to you?
>
> A. Yes.
>
> Q. Did he ever ask you to fill in portions or any sections of that personal financial statement?
>
> A. No.
>
> Q. Did he ever expressly tell you that he'd omitted any information from the personal financial statement?
>
> A. No.
>
> Q. Did you ever instruct him to omit any information off his personal financial statement?
>
> A. No.
>
> Q. Hypothetically, if Mr. Condidorio testifies that you were supposed to add information to this

4

> personal financial statement, would you disagree with that testimony?
>
> A. Yes, I would.
>
> Q. Hypothetically, if Mr. Condidorio testifies that you told him that you agreed to add information or that you agreed to omit information from the personal financial statement, would you disagree with that testimony?
>
> A. Yes, I would.
>
> Q. You never agreed to fill in any information on that personal financial statement, did you?
>
> A. No, that would not be my place at all.
>
> Q. Your understanding when you received it was that it was completely filled out by Mr. Condidorio?
>
> A. Yes.

(Tr. at 158-59). On cross-examination Miller agreed that he had at his disposal all the information about the liabilities that had been guaranteed by Condidorio and other members of RLG, and that such information was probably more accessible to him than to Mr. Condidorio (Tr. at 179-80). Miller testified that he apparently had not looked at the liabilities section of Condidorio's personal financial statement before he (Miller) gave it to Regions (Tr. at 181).

All discussions with Regions about this loan occurred between Miller and Webb up until the closing (Tr. at 182). When Condidorio arrived for the closing on February 25, 2008, he expected to be required to sign as a guarantor of the loan, as he

5

had for prior loans to RLG.  However, as Webb began to go over the closing papers, Condidorio discovered to his surprise that the loan documents indicated that he was to be the sole borrower (Tr. at 209).  Condidorio expressed his surprise and dismay and asked to speak privately with Miller.  (Tr. at 210).  In this private discussion with Miller, Condidorio stated that he understood that the loan was to be made to RLG with him and another member, Dr. Saks, signing as guarantors.  Miller explained that, unless they could obtain the Regions loan proceeds, RLG's primary lender, Textron Financial, was coming in two days to begin foreclosure on the golf course property, and that Textron was holding a $4 million promissory note that Condidoro, Miller, and Dr. Saks had personally guaranteed (Id.)  Condidorio initially refused to proceed with the closing, but after a few minutes and upon being told by Miller that he "really [has] no choice," he reconvened the closing with Webb and executed the documents for the Regions loan.  (Tr. at 210-11).  Insofar as the record shows, nothing was said at the closing about Condidorio's personal financial statement.

As agreed at the closing, all loan proceeds were disbursed to RLG (Tr. at 42-43; 162-63).  The proceeds were used to pay down a variety of RLG obligations to its creditors (Tr. at 163).[3]  RLG made monthly payments on the Regions note through

---

[3] Miller had told Webb that the purpose of the Regions loan was to serve as a "capital injection" into the golf course to pay for certain improvements that were to be made at the facility

6

October 8, 2008, after which the note went into default (Tr. at 46).

As of the date of the trial, the total due and owing to Regions on the note, including principal, interest and late charges was $255,997.96 (Tr. at 47).

### **Standard of Review**

The bankruptcy court's findings of fact should not be set aside unless clearly erroneous, <u>In re Zick</u>, 931 F.2d 1124, 1128 (6th Cir. 1991), and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses. Fed. R. Bankr. P. 8013.

The bankruptcy court's conclusions of law are reviewed <u>de novo</u>. <u>In re Batie</u>, 995 F.2d 85, 88 (6th Cir. 1993).

The party seeking to establish an exception to the discharge of a debt pursuant to 11 U.S.C. § 523(a)(2)(B) must prove the requisite elements by a preponderance of the evidence. <u>Grogan v. Garner</u>, 498 U.S. 279, 290-91 (1991). Moreover, exceptions to discharge are to be strictly construed against the creditor. <u>In re Rembert</u>, 141 F.3d 277, 281 (6th Cir. 1998).

### **Debtor's Assignments of Error**

Title 11, Section 523(a)(2)(B) of the United States Code excepts from discharge any debt for money or extension of credit to the extent obtained by:

---

(Tr. at 16).

>     (B) use of a statement in writing —
>         (i)   that is materially false;
>         (ii)  respecting the debtor's or an insider's
>               financial condition;
>         (iii) on which the creditor to whom the debtor
>               is liable for such money, property,
>               services, or credit reasonably relied;
>               and,
>         (iv)  that the debtor caused to be made or
>               published with intent to deceive.

Condidorio in his brief advances three assignments of error by the bankruptcy court. First, he argues that the bankruptcy court erred when it found that he had "caused [his personal financial statement] to be made or published" to Regions. Condidorio also asserts that the bankruptcy court committed error when it found that Regions "reasonably relied" upon his financial statement. Finally, Condidorio maintains that the bankruptcy court erred when it concluded that his signing an incomplete financial statement and failing to check it for completeness before Miller presented it to Regions "were so egregious and reckless that the debt should be held non-dischargeable." (Findings and Conclusions at 10).

## Discussion

<u>Whether Debtor "Caused [the Financial Statement] To Be Made Or Published</u>." Debtor first argues that he did not cause the financial statement to be made or published because he did not furnish it directly to Regions; instead, he gave it to Miller, who in turn gave it to Regions.

8

The bankruptcy court found that "Debtor did furnish the materially false financial statement to Regions Bank albeit through Mr. Miller." (Findings and Conclusions at 7). The bankruptcy court found that Debtor admitted that he provided Miller with a personal financial statement. The Court further noted that, according to Debtor's testimony, "he intended Mr. Miller to complete his personal financial statement and to use it to obtain funding for the golf course." (Findings and Conclusions at 7). The bankruptcy court, citing the case of In re Kakde, 32 B.R. 411 (Bankr. S.D. Ohio 2008), found that an agency relationship existed between Debtor and Miller and, at least by implication, Miller's act in providing Debtor's financial statement to Regions was the act of the Debtor.

The Debtor, on appeal, argues that the evidence failed to support a finding of agency between Debtor and Miller or, alternatively, Miller acted outside the scope of this agency when he furnished Debtor's financial statement to Regions without first filling in the omitted information about Debtor's guaranties of prior golf course loans (Docket Entry No. 3 at 10-11).

Regions, in response, maintains that documents from another source authorized by a debtor, as well as any documents personally supplied to the creditor by the debtor, fall within the scope of § 523(a)(2)(B). See In re Whisnant, 411 B.R. 559, 564-65 (Bankr. E.D. Tenn. 2009).

Here, it is undisputed that Condidorio filled out, signed and provided to Miller a personal financial statement with the understanding that Miller intended to furnish that financial statement to potential lenders, including Regions, to obtain credit for RLG. The undersigned Magistrate Judge finds that these undisputed facts support the bankruptcy court's finding that the subject financial statement was "caused to be made or published" by Condidorio within the meaning of § 523(a)(2)(B).

Whether Regions "Reasonably Relied" Upon Debtor's Financial Statement. Condidorio argues that the bankruptcy court erred in finding that Regions reasonably relied upon Debtor's financial statement when it made the loan to RLG.

The Sixth Circuit has held that "reasonable reliance" under § 523(a)(2)(B) "is a factual determination to be made in light of the totality of the circumstances." In re Ledford, 970 F.2d 1556, 1560 (6th Cir. 1992). Moreover, as a factual determination, the finding of the bankruptcy judge must be reviewed under the deferential clearly erroneous standard. In re Woolum, 979 F.2d 71, 75 (6th Cir. 1992).

Among the factors that a court may consider in determining the question of reasonable reliance are: (1) whether the creditor followed its established lending procedure in approving the loan; (2) whether the creditor used outside sources to verify the financial information provided by the debtor; (3)

10

whether the creditor had a previous relationship with the debtor; and (4) whether the writing contained any "red flags" that would have alerted the creditor of potential inaccuracies in the financial information provided. In re Sharp, 357 B.R. 760, 766 (Bankr. N.D. Ohio 2007).

Condidorio argues that Regions did not follow its established lending procedures in making the subject loan, and that there were several "red flags," not in Debtor's financial statement, but in the transaction.[4] Specifically, Debtor argues that the Regions loan officer, Webb, failed to transmit certain information to Makofski and Freeman, the Regions underwriters who approved the loan (Docket Entry No. 3 at 18-20). Freeman testified at trial that, if the information not transmitted by Webb had been available, it "could have made a difference" in their decision to approve the loan (Tr. at 132).

The Sixth Circuit has found that the reasonable reliance requirement imposed by § 523(a)(2)(B)(iii) "cannot be said to be a rigorous requirement, but rather is directed at creditors acting in bad faith." In re Martin, 761 F.2d 1163, 1166 (6th Cir. 1985). The Sixth Circuit has further stated, "the decisions that refer to

---

[4]Condidorio also points out that his financial statement failed to include his ownership interest in RLG among his assets, and that this omission should have prompted Regions to ask additional questions. (Docket Entry No. 3 at 23-24). His income tax return, also provided to Regions, showed a sizeable loss attributable to RLG.

11

'reasonable' or justifiable reliance do not require the court to undertake a subjective evaluation of the creditor's lending policy and practices; the decisions teach only that dischargeability should not be denied where a creditor's asserted reliance would be so unreasonable as to negate any actual reliance." In re Ledford, 970 F.2d 1556, 1560 (6th Cir. 1992) (citing In re Garman, 643 F.2d 1252, 1256 (7th Cir. 1980), cert. denied, 450 U.S. 910 (1981).

At trial, Regions underwriter Jeffrey Makofski testified that he relied upon Condidorio's personal financial statement in approving the Regions loan, and that had this financial statement disclosed approximately $5.5 million in contingent liabilities it could have affected his decision to approve the loan, or the terms and conditions that he would have required. (Tr. at 94-95).[5] Gary Freeman, Jr., another Regions underwriter who supervised Makofski, testified that he reviewed Makofski's underwriting analysis and issued the final approval on the loan (Tr. at 122). His approval was necessary because the loan to Condidorio was unsecured. (Tr. at 122-23). Freeman could not recall the specifics of his

---

[5]Makofski testified that, in addition to the personal financial statement and tax returns, Regions obtained a consumer credit report from Equifax on Condidorio. This credit report showed a satisfactory credit performance and generally matched the information provided in the personal financial statement. The credit report did not disclose Condidorio's contingent liabilities from his guaranties of earlier loans to RLG, and, on cross-examination, Makofski testified that such business loans did not ordinarily show up on consumer credit reports. (Tr. at 98-99; 108-09).

discussions with Makofski about this loan, but he testified that in the normal course of his work he reviews the credit file and the proposed borrower's financial statement and tax returns (Tr. at 123). Freeman testified that a personal financial statement is important in assessing whether a borrower has the net worth and liquidity to justify making an unsecured loan. (Id.) Freeman testified that he concurred in Makofski's approval of the loan to Condidorio, and that he would have relied upon Condidorio's personal financial statement in doing so. (Tr. at 127).

Given this testimony and the totality of the circumstances, and with due regard to the deferential standard on review given to the factual determination by the bankruptcy judge, the undersigned Magistrate Judge concludes that the bankruptcy court's finding that Regions reasonably relied upon Condidorio's financial statement cannot be said to be clearly erroneous.

Whether Condidorio Acted With Requisite Intent To Deceive. Under § 523(a)(2)(B)(iv), the creditor must demonstrate that the debtor intended the statement to be false or that the debtor published the statement with gross recklessness as to its truth. In re Martin, 761 F.2d 1163, 1167 (6th Cir. 1985) (citing In re Matera, 592 F.2d 378, 380 (7th Cir. 1979) and In re Houtman, 568 F.2d 651, 655-56 (9th Cir. 1978).

Here, the bankruptcy judge concluded that the proof failed to show that Condidorio directly intended to deceive

13

Regions. However, she found that his actions amounted to recklessness sufficient to justify denial of his discharge. The bankruptcy court stated:

> Finally, pursuant to 523(a)(2)(B)04, the creditor must demonstrate by a preponderance of the evidence that the Debtor intended to deceive the creditor. Actual knowledge of falsity and conscious intent to deceive are not necessary; intent may be inferred where the Debtor made no effort to verify facts stated and had no reasonable grounds to believe that the facts were correct.
>
> I point the parties to the AmSouth Financial Corporation versus Warner case, a Western District of Tennessee Case decided in 1994.
>
> It is held in Haney versus Copeland, a case decided by the Eastern District of Tennessee in 2003, Bankruptcy Court there, it is unacceptable for a Debtor to think that he can blindly sign documents upon which any reasonable person would realize were being relied on without any thought, care or consideration for the contents contained therein.
>
> In the present case the proof did not show the Debtor directly intended to deceive Regions Bank; however, his actions in signing an incomplete financial statement and in not checking it before it was given to Regions if he, indeed, intended Mr. Miller to fill out certain points were so egregious and reckless that the debt should be held non-dischargeable.
>
> The Debtor, who is a Vice President of the corporation, signed incomplete financial statements, at best assuming that Mr. Miller would fill in the missing information. He did not check the document nor did he ask for or keep copies of his other personal financial statements and he did not ask for or keep copies of the several loan guarantees that he had previously signed, despite the significantly large amounts being guaranteed.
>
> Unfortunately, the Debtor's blind signing, failing to check the document afterwards, and supplying of an incomplete financial statement and reckless signing of loan documents without regard for the possible negative consequences caught up with him.

> For these reasons which represent the Court's findings of fact and conclusions of law, the Court holds that the debt to Regions Bank is non-dischargeable pursuant to 523(a)(2)(B).

(Findings and Conclusions at 9-11).

As the bankruptcy court in this district has observed, the term "gross recklessness" appears to be a term of art with only minimal use outside the bankruptcy arena and, despite its use since the Sixth Circuit opinion in <u>Martin</u>, it has not been defined. <u>See</u> <u>In re Sansom</u>, 224 B.R. 49, 57 n.11 (Bankr. M.D. Tenn. 1998). That court concluded that "the recklessness standard includes the qualifier 'gross' to mean flagrant, indicating mental attitude of the debtor that would be the evidentiary equivalent of intent to deceive." (<u>Id.</u>)

In the case of <u>In re Gordon</u>, 277 B.R. 796 (Bankr. M.D. Ga. 2001), cited in Debtor's brief, the court stated:

> Finally, Plaintiff must show that Defendant caused her financial information to be made or published with an intent to deceive. Plaintiff must show that Defendant's financial information "was either knowingly false or made so recklessly as to warrant a finding that [Defendant] acted fraudulently." 4 <u>Collier on Bankruptcy</u> § 523.08[2][3][ii] (15th ed. rev. 2001).
>
> In <u>Equitable Bank v. Miller</u>, (<u>In re Miller</u>), [39 F.3d 301 (11th Cir. 1994)] the Eleventh Circuit Court of Appeals stated:
>
>> Whether a debtor in bankruptcy acted with the requisite "intent to deceive" under § 523(a)(2)(B) is an issue of fact, and the bankruptcy court's findings as to this issue are reviewed by both the district and appellate courts under the clearly

15

> erroneous standard. See Matter of Martin, 963 F.2d 809, 814 (5th Cir. 1992); In re Liming, 797 F.2d 895, 897 (10th Cir. 1986); In re Long, 774 F.2d 875, 877-78 (8th Cir. 1985).
>
> * * *
>
> "Because a determination concerning fraudulent intent depends largely upon an assessment of the credibility and demeanor of the debtor, deference to the bankruptcy court's factual findings is particularly appropriate." In re Burgess, 955 F.2d 134, 137 (1st Cir. 1992) (citing Williamson v. Fireman's Fund Ins. Co., 828 F.2d 249, 252 (4th Cir. 1987); see also Martin, 963 F.2d at 814; see generally Bankruptcy rule 8013.

39 F.3d at 304-05.

As quoted above, the bankruptcy court found that Condidorio's signing a financial statement that omitted approximately $5.5 million of contingent liabilities and his failure to check this financial statement for accuracy before it was presented to Regions by Miller "were so egregious and reckless that the debt should be held non-dischargeable." (Findings and Conclusions at 10).

At trial Condidorio testified that "the agreement was" that Miller would provide the financial statement form, that Condidorio would fill it out "best [he] could," and that Miller would fill in the information about the contingent liabilities "because he was the holder and keeper of those liabilities." (Tr. at 205). Condidorio later testified that he "expected Mr. Miller

16

to take [Condidorio's] personal financial statement, fill in the information that [Condidorio] did not have in terms of the other loans" and his ownership percentages because Condidorio "didn't have access to that." (Tr. at 212). Despite Condidorio's use of the word "agreement" quoted above, Condidorio failed to testify that there had ever been any express agreement, or even a specific discussion, regarding Miller's obligation to add information to Condidorio's financial statement before furnishing it to Regions. Miller at trial denied that there had been any understanding or agreement that he would add information to Condidorio's financial statement. (Tr. at 144; 157-59).

From the totality of the circumstances, the bankruptcy judge found that the acts and omissions of Condidorio were sufficiently reckless to infer an intent to deceive under § 523(a)(2)(B)(iv). From a review of the entire record, the undersigned Magistrate Judge is unable to conclude that the bankruptcy judge's finding is clearly erroneous.

### **RECOMMENDATION**

For the reasons stated above, the undersigned Magistrate Judge **RECOMMENDS** that the decision of the bankruptcy court be **AFFIRMED** and the Debtor's appeal be **DISMISSED**.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days from service of this Report and Recommendation in which to file any written objections to this

17

Recommendation, with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in this Report in which to file any responses to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. <u>Thomas v. Arn</u>, 474 U.S. 140 (1985), <u>reh'g</u> <u>denied</u>, 474 U.S. 1111 (1986).

      **ENTERED** this 23rd day of February 2011.

<u>s/ John S. Bryant</u>
JOHN S. BRYANT
United States Magistrate Judge